**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ISTAR CAPITAL LIMITED,<br><br>                    Plaintiff,<br><br>          v.<br><br>TENNOR LLC; TENNOR INTERNATIONAL AG; SUMMIT GLOBAL GROUP INVESTMENTS, LLC; SUMMIT PROPERTY, LLC; and LARS WINDHORST,<br><br>                    Defendants. | **Civil Action No.** _____<br><br><br>**PLAINTIFF'S COMPLAINT** |

Plaintiff Istar Capital Limited ("Istar" or "Plaintiff") files this original Complaint against Tennor LLC; Tennor International AG ("Tennor AG"); Summit Global Group Investments, LLC ("Summit Global"); Summit Property, LLC ("Summit Property") (together, the "Windhorst Entities"); and their individual principal Lars Windhorst ("Windhorst") (collectively, "Defendants") and alleges as follows:

## I.    NATURE OF THE CASE

1.     The claims in this case arise, at bottom, from a sale and repurchase arrangement between Plaintiff and Defendants (collectively, the "Parties"), which was induced by fraud and which devolved further into fraud and misconduct, up to and including outright forgeries of payment documentation, as Defendants have endeavored to escape a series of obligations owed to Plaintiff and abscond with the funds that Plaintiff extended to them. Under the terms of the initial governing agreement, Audacia Capital Limited ("Audacia") (an entity related to Windhorst and acting at his direction) would purchase sixty-five units of bonds (the "Voltaire Bonds") issued by Voltaire Finance B.V. (another entity controlled by the individual Defendant Windhorst), from

1

Plaintiff as the second 'leg' of the Parties' buyback arrangement. However, Defendants – including the ultimate party in interest Windhorst and the *alter ego* Defendant entities that he controls – defrauded Plaintiff, failed to perform under the initial agreement and the several that followed it, and strung Plaintiff along into agreement after agreement that Defendants ultimately and deliberately breached.

2.      At all times relevant to the agreements at issue, Windhorst exercised full control over the other Defendants involved in the agreements. Furthermore, and as set forth in greater detail below, Windhorst utilized Tennor LLC, Tennor AG, Summit Global, and Summit Property as extensions of himself to perpetuate the subject fraud against Plaintiff. At Windhorst's direction and as set forth in further detail below, the Windhorst Entities disregarded the corporate forms of these entities, commingled assets and obligations among them, and utilized them in the course of the wrongdoing now complained of.

3.      To wit, and in light of the facts now adduced upon litigation in the DIFC Courts and further investigation, it is clear that Windhorst and the Windhorst Entities induced the entire buyback arrangement between the Parties, and each of the specific agreements constituting that arrangement and entered into in the course of Plaintiff's efforts to secure repayment, with the then-present intention to disregard their obligations thereunder and thus to convert the funds extended to them to Windhorst's use and benefit. More particularly, when the Parties entered into the initial buyback arrangement, Windhorst's and the Windhorst Entities' financial position was substantially more precarious than represented to Plaintiff Istar, and Windhorst individually then intended to cause the Windhorst Entities to disregard their obligations to Plaintiff, and to effect that wrongful conversion of funds.

4.     For over a year, Defendants made false representations to Plaintiff that they were in the process of fulfilling their contractual obligations to repurchase the Voltaire Bonds. Upon the inducements of Windhorst, and negotiations between the Parties, Plaintiff entered into successive written agreements with Audacia, Tennor AG, and then Tennor LLC. Windhorst also entered into a personal guarantee of payment as part of these efforts to resolve the matter; that guarantee, too, went unsatisfied. Due to the breaches and misrepresentations of Defendants, Plaintiff was forced to seek payment by way of litigation in multiple jurisdictions to date, and to enter into repeated negotiations and settlements that have still not led to full payment for the Voltaire Bonds by Defendants.

5.     Mr. Windhorst personally signed separate purchase agreements as the representative for his *alter ego* entities, Tennor AG and Tennor LLC. Notably, Windhorst founded Tennor LLC just days before using its name to sign the third purchase agreement in this series. Tennor LLC's sole member is Summit Global, which was also founded near the date of the agreement and is also owned and controlled by Windhorst. These layers of entities, heretofore used by Windhorst to evade individual liability and dissipate assets, are devoid of any apparent operational purpose and are themselves an indicium of both fraud and *alter ego* status. Windhorst has effectively treated these entities as an extension of himself and as conduits for the improper diversion of the Windhorst Entities' assets to his personal use and benefit – as he himself has previously admitted under oath. Upon information including public reporting of the contents of his testimony, in July of 2023 and in the course of separate proceedings brought by another creditor in the High Court of England and Wales, Windhorst admitted in open court that he regularly funds his personal lifestyle (including certain remarkable personal expenses) directly from the assets of his various companies. As he then acknowledged under cross-examination, "My lifestyle is to a

3

very large extent linked to my business activities and therefore the majority of my lifestyle expenses are funded by companies of the group." *See* **Exhibit 14**, Robert Smith, *Indebted financier Lars Windhorst denied living 'billionaire lifesyle'*, FINANCIAL TIMES (July 12, 2023), *located at* https://www.ft.com/content/c0aabc06-5c9d-4f32-ac10-9af49e11695e. This, too, is a powerful indicium of fraud and of *alter ego* status – and of habitual improper dissipation of assets.

6.      Due to Defendants' fraudulent conduct and repeated breaches of binding contracts, Plaintiff was forced to spend time and money in chasing after payments, negotiating settlements, and entering into agreements one after the other that were ultimately breached by Defendants. Furthermore, because of Defendants' fraudulent inducement, Plaintiff is left holding EUR 6,500,000 in bonds which have limited standalone economic value.

7.      Accordingly, Plaintiff now brings this action against Defendants before this Court.

## II.      PARTIES

8.      Plaintiff Istar Capital Limited is a limited company incorporated in the United Arab Emirates with its registered address at Unit 604, Index Tower, Dubai International Financial Centre ("DIFC"), Dubai, 507268, United Arab Emirates.

9.      Upon information and belief, Defendant Tennor LLC is a Delaware limited liability company with its registered office at c/o Northwest Registered Agent Service, Inc., 8 The Green, Suite B, Dover, Delaware 19901. Upon information and belief, Tennor LLC is 100% owned by Summit Global Group Investments, LLC.

10.     Upon information and belief, Defendant Tennor International AG is a company incorporated and existing under Swiss law, having its registered office at Gubelstrasse 11, 6300 Zug, Switzerland, with company registration number CHE-173.023.747.

11.     Upon information and belief, Defendant Summit Global Group Investments, LLC is a Delaware limited liability company with its registered address at c/o Northwest Registered Agent Service, Inc., 8 The Green, Suite B, Dover, Delaware 19901.

12.     Upon information and belief, Defendant Summit Property, LLC is a California limited liability company with its principal address at Zuglex Trustee AG, Gubelstrasse 11, CH-6302 Zug, Switzerland. Its mailing address is P.O. Box 7106, Zug, CH-6302, Switzerland. The company's registered agent is Lars Windhorst, with a given address of 1426 Summitridge Drive, Beverly Hills, California 90210.

13.     Upon information belief, Defendant Lars Windhorst is a German citizen residing in Zug, Switzerland. Upon information and belief, Windhorst is variously the founder, member and controlling shareholder, CEO, and manager of Tennor LLC, Tennor AG, Summit Global, and Summit Property.

### III.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendant Windhorst because the final executed agreements entered into, in the course of the Parties' business, committed any and all disputes arising in respect of the transactions to the exclusive jurisdiction of the courts sitting in New York. This Court also has personal jurisdiction over all Defendants as *alter egos* of the parties to those agreements and to each other, and as co-conspirators in the course of the concerted wrongdoing complained of in this action.

16.     Venue in this Court is proper because the Parties agreed, in two valid and enforceable forum selection clauses, to litigate all disputes arising from the agreement at issue in the courts sitting in New York, and Defendants have thus expressly and collectively waived any objection to venue in this Court.

### IV.    ALLEGATIONS OF FACT

17.     In mid-2024, Windhorst proposed to Plaintiff a short-term financing arrangement, pursuant to which Defendants would be extended EUR 6.5 million in funds by way of a sale and repurchase arrangement.

18.     Pursuant to the arrangement, on or about June 14, 2024, Istar and Audacia entered into a Securities Sale and Purchase Agreement (the "Audacia Agreement"), which would effect the second leg of the sale and repurchase arrangement, and pursuant to which Audacia agreed to repurchase the Voltaire Bonds from Istar for EUR 6,500,000. A true and correct copy of the Audacia Agreement is attached as **Exhibit 1** and incorporated herein by reference.

19.     Additionally, on or about June 28, 2024, Istar and Tennor Holdings B.V., another entity owned and controlled by Windhorst, entered into a Call Option Agreement whereby Tennor Holdings B.V. granted Istar an option to purchase 857,143 ordinary shares of Wild Bunch AG (the "Wild Bunch Call Option"). This call option was non-deliverable, meaning that Tennor Holdings B.V. would pay Istar a cash settlement amount of the market price of the option shares minus EUR 6.5 million, in lieu of delivery of the shares, when Istar would exercise the call option. However, the option could not be exercised until six months after the date of the agreement. A true and correct copy of the Wild Bunch Call Option is attached as **Exhibit 2** and incorporated herein by reference.

20.    As set forth above, the Audacia Agreement was not an economically standalone transaction. Instead, it was part of a short-term financing structure introduced to Istar by Windhorst, upon terms that he proposed and induced Plaintiff to accept.

21.    The Voltaire Bonds had limited standalone value to Istar because effective enforcement rights could only be exercised by bondholders exceeding a 25% holding threshold, which Windhorst himself meets but Istar did not and does not meet, and because the Voltaire Bonds thus lacked a secondary market. Because Windhorst himself was understood to meet that holding threshold, however, Plaintiff understood the Voltaire Bonds to retain substantial value to Audacia and thus to Windhorst.

22.    Section 3.2 of the Audacia Agreement set out a three-step process for performance thereunder upon the maturity of the buyback arrangement. First, Istar would deliver a trade confirmation specifying the Voltaire Bonds to be repurchased by Audacia and the payment details. Second, Audacia was to transfer the agreed EUR 6.5 million to the designated brokerage account. Third, upon receipt of payment, Istar was to deliver a duly-executed stock transfer form to effect the transfer of title to the Voltaire Bonds back to Audacia.

23.    On July 2, 2024, Istar delivered a trade confirmation to Audacia per the contract requirements, but Audacia failed to perform and did not make payment pursuant to the Audacia Agreement, at the required time or thereafter.

24.    Upon this first default, Istar attempted to mitigate its damages by marketing the Voltaire Bonds on the secondary market, but those efforts were unsuccessful because the Voltaire Bonds were impaired in value as set forth above and lacked a liquid market.

25.    Istar thus commenced proceedings in the DIFC Courts and obtained a final judgment (the "DIFC Judgment") ordering Audacia to pay (1) a principal sum of EUR 6,500,000;

(2) pre-judgment interest calculated up to and including March 23, 2025, in the amount of EUR

1,415,753, and at a daily rate of EUR 5,342.47 from March 23, 2025 to and through June 9, 2025;

(3) post-judgment interest at the rate of 9% per annum starting on June 10, 2025; and (4) Istar's

costs. A true and correct copy of the DIFC Judgment is attached as **Exhibit 3** and incorporated

herein by reference.

26.    Instead of making payment pursuant to the final judgment, Defendants entered into

negotiations with Plaintiff to induce Plaintiff into making a new deal.

27.    In its continuing efforts to secure payment, Istar agreed that Windhorst's Swiss

company, Tennor AG, would step into Audacia's shoes and repurchase the Voltaire Bonds from

Istar for EUR 6.7 million, thus providing a substantial discount against the amount ordered to be

paid under the DIFC Judgment in exchange for prompt payment.

28.    Accordingly, on or about January 19, 2025, Istar and Tennor AG entered into a

Securities Sale and Purchase Agreement ( the "Tennor AG Agreement") under which Tennor AG

undertook to repurchase the same Voltaire Bonds for EUR 6,700,000, with payment to be effected

in four installments beginning on January 20, 2025, and ending on February 28, 2025. A true and

correct copy of the Tennor AG Agreement is attached as **Exhibit 4** and incorporated herein by

reference.

29.    Again, Windhorst's entity Tennor AG failed to make any of these four installment

payments.

30.    On or about February 11, 2025, Windhorst emailed Istar stating that he is the sole

director of Voltaire Finance BV and Tennor AG, and that he "herewith give[s] an irrevocable

undertaking that [he] will call for a bondholder meeting [o]f Voltaire Finance BV bondholder[s]

to vote for cancellation of bonds and pro rata release of Wild Bunch AG shares to each Voltaire Finance BV bondholder."

31.     Windhorst failed to fulfill this binding undertaking, in that he failed to call the subject bondholder meeting to effect the cancellation of the Voltaire Bonds and release the subject Wild Bunch AG shares to Istar.  This failure prevented Istar from liquidating those shares in satisfaction of Defendants' continuing debt.

32.     However, within that same time frame, Windhorst did agree to cause Tennor AG's affiliate Severn Reinsurance Securities B.V. to transfer to Istar certain other securities, and to make a cash payment in the amount of EUR 1.5 million. Audacia ultimately did transfer the subject securities, effecting a transfer of value in the approximate amount of EUR 3.0 million, but again did not fulfill its obligation to make the required cash payment. The remaining amount due under the Tennor AG Agreement thus then stood at EUR 3.7 million.

33.     On or about June of 2025, an Amsterdam court appointed a liquidator for Tennor Holdings B.V. after Dutch tax authorities asked a court to wind up the company over an unpaid debt of EUR 5.3 million to an unrelated creditor. Accordingly, Istar could no longer attempt to exercise the Wild Bunch Call Option it held.

34.     In this context, on or about July 28, 2025, Istar and Tennor AG entered into an Amended and Restated Securities Purchase Agreement ("Amended Tennor AG Agreement") to amend the terms of the Tennor AG Agreement. As part of the amendment, the parties agreed to settle all claims and disputes arising in connection with the DIFC Judgment. Under the Amended Tennor AG Agreement, Tennor AG was to pay Istar EUR 2,000,000 in two tranches within five

business days and transfer 56,180 shares of Heckler & Koch AG shares ("H&K Shares") to Istar.[1] A true and correct copy of the Amended Tennor AG Agreement is attached as **Exhibit 5** and incorporated herein by reference.

35.     Yet again, Windhorst's entity Tennor AG wholly failed to perform. Istar thus commenced legal proceedings against Tennor AG in Switzerland, which remain pending as of the date of this pleading.[2]

36.     In late 2025, Plaintiff again attempted to achieve a comprehensive settlement across the Windhorst group to resolve all disputes and finally effect the repurchase of the Voltaire Bonds.

37.     Tennor LLC is a Delaware limited liability company established on September 23, 2025 by Summit Global, whose sole Member and Manager is Windhorst.

38.     Summit Global is a Delaware limited liability company created on September 19, 2025, also by Mr. Windhorst.

39.     Upon information and belief, including information concerning the increasingly parlous state of Windhorst's affairs in late 2025, Tennor LLC and Summit Global were created by Windhorst primarily if not entirely for the purpose of continuing his efforts to evade his obligations to Istar. Otherwise put, Windhorst created an *alter ego* entity to then create another *alter ego* entity to then enter into another agreement with Istar in order to frustrate full and final payment for the Voltaire Bonds. Upon further information and belief, liquid funds controlled by Windhorst and due to be paid to Istar were instead diverted to a purchase of certain real property within the United

---

[1] By the Amended Tennor AG Agreement, the Parties also mutually acknowledged that Istar had then incurred EUR 800,000 in costs of enforcement, which were also due to be reimbursed under the DIFC Judgment and the original unamended Tennor AG Agreement.

[2] On February 3, 2026, the Cantonal Court of Zug issued an order requiring submission by Tennor AG of a statement of defense, within five days of that order. A true and correct copy of that order of the Zug Court is attached as **Exhibit 6** and incorporated herein by reference.

States *via* the Windhorst entities including Summit Global and its wholly-owned subsidiary Summit Property, which was not disclosed to Istar and thus constituted a material omission in furtherance of the ongoing course of fraud.

40.     Upon further negotiations, on July 10, 2025, Windhorst executed a personal guarantee in favor of Istar, guaranteeing the transfer of EUR 1,500,000 in partial satisfaction of the debt, to be paid in two tranches by July 21, 2025 (the "Windhorst Guarantee"). A true and correct copy of the Windhorst Guarantee is attached as **Exhibit 7** and incorporated herein by reference.

41.     On November 6, 2025, Istar and Tennor LLC entered into a sale agreement whereby, as part of the wider, coordinated settlement between the Parties, Tennor LLC would pay USD 2,500,000 to Istar in final payment for the repurchase of the Voltaire Bonds (the "Tennor LLC Agreement"). The Tennor LLC Agreement also contains a forum selection clause committing any and all disputes arising in respect of the transaction to the adjudication of the courts sitting in New York. A true and correct copy of the Tennor LLC Agreement is attached hereto as **Exhibit 8** and incorporated herein by reference.

42.     On that same date, Istar and Tennor LLC also entered into a side letter to the Tennor LLC Agreement (the "Tennor Side Letter"), establishing certain conditions precedent which were satisfied by Istar on November 10, 2025; agreeing that the obligations arising under the Tennor LLC Agreement were not standalone or additional consideration, but were to be treated strictly as a component of the overall settlement; and again committing any dispute to the exclusive jurisdiction of the courts of New York. A true and correct copy of the Tennor Side Letter is attached hereto as **Exhibit 9** and incorporated herein by reference.

43.     Similar to the previous agreements, neither Windhorst nor his fresh Tennor LLC and Summit Global entities had any intention to actually perform under the agreement. Instead, Windhorst caused Tennor LLC to enter into the transaction for the purpose of further evading his obligations to Istar. The *seriatim* shuffling of those obligations from one entity to another, without any apparent provisions for commensurate transfers of value between and among the Windhorst Entities, constituted a course of action that disregarded the corporate forms of those entities and commingled their obligations while also shuffling assets between and among the entities. That shuffling of assets, and their diversion to Windhorst's personal use and benefit, in the face of his and his entities' debt to Istar, also constituted dissipations of assets in deliberate frustration of recovery by Istar.

44.     Tennor LLC did not make any payment to Istar under the Tennor LLC Agreement.

45.     Windhorst did not make any payment to Istar under the Windhorst Guarantee.

46.     On November 20, 2025, Istar served a formal notice of default under the Tennor LLC Agreement upon Tennor LLC ("November 20 Demand Letter"). Istar gave Tenor LLC until November 21, 2025, to make full payment. A true and correct copy of the November 20 Demand Letter is attached as **Exhibit 10** and incorporated herein by reference.

47.     On November 24, 2025, Istar served a letter before action upon Tennor LLC ("November 24 LBA"), demanding full payment by the end of that day. A true and correct copy of the November 24 LBA is attached as **Exhibit 11** and incorporated herein by reference.

48.     In response, Windhorst personally asserted that payment had then already been made, *via* WhatsApp correspondence, and himself provided what purported to be two certifications of payment from an accountant acting for Tennor LLC. Those statements by Windhorst were then false, as Windhorst knew; no funds were received by Istar.

49.     Furthermore, upon detailed examination, the putative certification proved to be a fabrication. In short, as of the end of 2025, Windhorst's financial position had apparently deteriorated to the point at which he began to forge operative documents and deliver them to Istar with the clear intention that Istar would rely upon them, and Istar did. This fabrication thus constituted both a discrete instance of fraud in itself, and yet another indicium of fraud in the entire course of affairs between and among Istar, on the one hand, and Windhorst and the Windhorst Entities, on the other. True and correct copies of the false payment certifications delivered to Istar by Windhorst are attached as **Exhibit 12** and **Exhibit 13** and incorporated herein by reference.

50.     Tennor LLC failed to make any payments in response to the November 20 Demand Letter and the November 24 LBA and has not made any such payment as of the date of this pleading.

51.     Upon information and belief, including Istar's knowledge of Windhorst's uses of the Windhorst Entities and the ways in which he caused them to act, as developed over time, Defendants conspired and acted in willful concert throughout the course of the foregoing dealings, with the then-present intention to defraud Istar, and effected the foregoing overt acts in furtherance of that conspiracy.

## V.     CONDITIONS PRECEDENT

52.     All conditions precedent to the causes of action set forth herein have occurred, been satisfied, or waived.

## VI.     CAUSES OF ACTION

### COUNT 1
### Breach of Contract - as to the Tennor LLC Agreement

53.     Istar realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

54.    Istar brings a breach of contract claim against Tennor LLC, and against all other Defendants as *alter egos* of Tennor LLC.

55.    Istar and Defendants entered into a buyback agreement whereby Defendants would purchase the Voltaire Bonds held by Istar.

56.    Pursuant to the agreement, Istar entered into multiple purchase agreements, one after the other, to sell the Voltaire Bonds to Audacia, Tennor AG, and then, finally, Tennor LLC.

57.    Defendants cycled through each other to enter into agreements with Istar for the purpose of delaying payment and frustrating completion of the repurchase of the Voltaire Bonds as agreed to by Defendants.

58.    As part of each purchase agreement entered into by the Parties, Defendants had to make certain payments to Istar within a specified period of time.

59.    Defendants breached the initial buyback agreement and the following purchase agreements one after the other and failed to make the full payment to Istar for the Voltaire Bonds within the agreed timeframes.

60.    Following negotiations, the last purchase agreement for the Voltaire Bonds – the Tennor LLC Agreement – was entered into by Istar and Tennor LLC on November 6, 2025.

61.    Tennor LLC breached that contract with Istar by failing to make the agreed payment for the Voltaire Bonds.

62.    Defendants' actions constitute breach of contract under New York law.

63.    As a result of Defendants' breach, Istar has suffered economic, special, general, consequential, and incidental damages.

64.    Defendants' willful and material breach of the Tennor LLC Agreement substantially defeats the purpose of that agreement.

65.    Therefore, Defendants are liable to Plaintiff for the remaining amount due in satisfaction of their obligation to repurchase the Voltaire Bonds, in order for Istar to receive the benefit of its bargain, in an amount to be determined upon trial but, in any case, in excess of the Court's jurisdictional limit.

## COUNT 2
### Breach of Contract - as to the Windhorst Guarantee

66.    Istar hereby incorporates and re-alleges the allegations set forth above.

67.    Istar brings a breach of contract claim against Lars Windhorst, individually, and against the remaining Defendants as *alter egos* of Windhorst.

68.    As part of the then-ongoing settlement negotiations involving the Voltaire Bonds, Audacia, and Tennor AG, Windhorst executed the Windhorst Guarantee on July 10, 2025, and thereby committed to transfer to Istar two tranches of payments of EUR 750,000 each, for a total of EUR 1,500,000.

69.    The first payment was to be made on July 16, 2025, and the second payment on July 18, 2025.

70.    Windhorst failed to make the subject payments and thus breached the written personal guarantee that was negotiated between the parties.

71.    As a result of Defendants' breach, Istar has suffered economic, special, general, consequential, and incidental damages.

72.    Defendants' willful and material breach of the Windhorst Guarantee substantially defeats the purpose of that agreement.

73.    Defendants' actions constitute breach of contract under New York law.

74.    Therefore, Defendants are liable to Plaintiff for the entire amount due under the Windhorst Guarantee.

## COUNT 3 – Fraud and Conspiracy to Commit Fraud
### (In the Alternative)

75.     Istar hereby incorporates and re-alleges the allegations set forth above.

76.     Windhorst, individually and through the *alter ego* Defendants, committed fraud against Istar in relation to the repurchase of the Voltaire Bonds.

77.     Defendants misrepresented to Istar that they then intended to repurchase the Voltaire Bonds from Istar as part of a buyback arrangement, pursuant to a broader short-term financial structure introduced by Defendants.

78.     Defendants also misrepresented to Istar the true state of their affairs, and omitted to state material information, including but not limited to information regarding their dissipation of assets to Windhorst's personal use and benefit, whose omission rendered their representations as to the true state of their affairs substantively false.

79.     At the time of the subject misrepresentations and omissions, Defendants then intended not to complete the purchase of the Voltaire Bonds.

80.     Defendants intended to induce Istar to rely on their misrepresentations.

81.     Istar justifiably and reasonably relied on their misrepresentations, agreed to the buyback arrangement, and entered into agreements with Defendants multiple times to effect the full and final repurchase of the Voltaire Bonds.

82.     None of the Defendants ever completed payment for the Voltaire Bonds.

83.     Instead, the Defendants took turns inducing Istar to enter into agreement after agreement with a different entity for the repurchase of the Voltaire Bonds, convincing in each instance Istar that it would finally receive payment from a different entity.

84.     As set forth above, and in a discrete and flagrant instance of fraud, Windhorst even sent to Istar forged payment confirmations, to further delay Istar's recovery efforts.

16

85.    Istar further relied on the misrepresentations of the Defendants, in that Istar delayed recovery efforts, and incurred substantial costs not only in enforcement efforts, but also in its continuing attempts to conduct good faith negotiations with Defendants and to find alternative solutions to the Defendants' failures to effect payment and forwent other investment opportunities.

86.    Upon information and belief, including Istar's knowledge of Windhorst's uses of the Windhorst Entities and the ways in which he caused them to act, as developed over time, Defendants conspired and acted in willful concert throughout the course of the foregoing dealings, with the then-present intention to defraud Istar, and effected the foregoing overt acts in furtherance of that conspiracy.

87.    Defendants' actions constitute fraud and conspiracy to commit fraud under New York law.

88.    As a result of the Defendants' actions, Istar was induced to acquire and retain the Voltaire Bonds, which had and have negligible standalone economic value.

89.    Moreover, Istar suffered reliance damages in the form of costs incurred in resolution and enforcement efforts and in the form of lost economic opportunities, all of which were reasonably foreseeable to Windhorst and the Windhorst Entities.

90.    Equity requires that Istar be compensated for its losses suffered as a result of Defendants' fraud.

91.    Defendants are therefore liable to Plaintiff for damages suffered due to this course of fraud, in an amount to be determined at trial but, in any case, not less than the jurisdictional limit of this Court.

## COUNT 4 – Unjust Enrichment
### (In the Alternative)

92.     Istar hereby incorporates and re-alleges the allegations set forth above.

93.     Istar and Defendants entered into a sale and repurchase arrangement upon terms proposed and induced by Windhorst and the Windhorst Entities.

94.     Defendants were enriched by the short-term financing received as a result of the sale and repurchase arrangement.

95.     Defendant's enrichment was at Istar's expense, as Istar was wrongfully induced to acquire and hold on to the Voltaire Bonds having negligible standalone economic value.

96.     Defendants were thus unjustly enriched pursuant to New York law.

97.     It is against equity and good conscience to permit Defendants to retain the benefits of the financing structure.

98.     Defendants are thus liable to Plaintiff for unjust enrichment as a matter of New York law.

## COUNT 5 – Preliminary and Permanent Injunctive Relief

99.     Istar hereby incorporates and re-alleges the allegations set forth above.

100.     Defendants entered into a scheme to induce, and did induce, Istar into a buyback agreement with no then-present intention to perform, which left Istar holding the Voltaire Bonds with no secondary market and forced Istar to pursue enforcement measures and to enter into a series of remediative agreements that were consistently breached by Defendants.

101.     Moreover, in the course of that scheme and as part of it, Windhorst has caused the Windhorst Entities to disregard the forms of those entities and to commingle assets and liabilities,

and Windhorst has personally plundered the entities, including but not limited to the conversion of the funds extended by Istar to Windhorst's personal benefit.

102.    Defendants' use of shell companies in its scheme to defraud Istar demonstrates that Defendants are likely to take steps to restructure, conceal, or move assets to avoid judgment once again upon commencement of this action.

103.    There is thus acute risk that Defendants will further dissipate substantial assets prior to an entry of final judgment by this Court, frustrating the prospects of recovery.

104.    Istar is likely to succeed on the merits of its claims. *Inter alia*, Windhorst and Tennor LLC are unquestionably in default under the Tennor LLC Agreement and the Windhorst Guarantee, and the forgeries of the putative payment confirmations delivered to Istar by Windhorst himself are apparent upon the face of the documents, which purported to confirm payments that were in fact never made.

105.    Defendants' scheme to defraud Istar, and to dissipate assets to prevent Istar's recovery have caused, and continue to cause, great and irreparable injury to Istar, if Defendants are not enjoined from further dissipation of assets.

106.    Without immediate injunctive relief by this Court, Defendants will render themselves judgment-proof and Istar will be prevented from recovering.

107.    Defendants would suffer no cognizable harm if prevented from dissipating their assets until a judgment is reached by this Court.

108.    An injunction would serve to further the public interests against fraud and in upholding contracts, as well as the efficiency and efficacy of the proceedings.

109.    By reason of the foregoing, Istar is entitled to injunctive relief against Defendants restraining them from dissipating their assets as set forth below.

## VII.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Istar prays that Defendants be commanded to appear and answer and that Istar have and recover the following from Defendants:

a.  Preliminarily and permanently enjoin Defendants, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participating with any of them from taking any action that would diminish the value, availability, or traceability of Defendants' assets, including but not limited to transferring, withdrawing, gifting, pledging, converting, or otherwise dissipating assets, except in the ordinary course of business and upon five business days' prior written notice to Plaintiff, pending further order of this Court or full and final satisfaction of Defendants' obligations to Plaintiff;

b.  judgment for damages in a sum exceeding the Court's minimum jurisdictional limit;

c.  equitable restitution of the funds extended to Defendants and remaining unreimbursed to their unjust enrichment, and of the costs incurred by Istar as a result of Defendants' breaches and delicts;

d.  Istar's reasonable attorneys' fees incurred in this action;

e.  costs of this action;

f.  pre-judgment and post-judgment interest in the maximum amount allowed by law;

g.  punitive damages pursuant to New York common law (as preserved by N.Y. Gen. Bus. Law § 360-o) on account of Defendants' gross, wanton, willful, and malicious conduct; and

h.  all other and further relief, in law or in equity, to which Plaintiff Istar may justly be

entitled.

DATED:    February 6, 2026                                Respectfully submitted,


By:  */s/ Timothy J. McCarthy*
      **Timothy J. McCarthy**
      NY Bar No. 3996345
      TMcCarthy@dykema.com
      **DYKEMA GOSSETT PLLC**
      1717 Main Street, Suite 4200
      Dallas, Texas 75201
      Telephone: (214) 462-6400
      Facsimile: (214) 462-6401

      -and-

      **Vincent Filardo, Jr.**
      vincent.filardo@us.kwm.com
      **KING & WOOD MALLESONS LLP**
      500 Fifth Avenue, 50th Floor
      New York, NY 10110
      Telephone: (347) 926-7570
      Facsimile: (917) 591-8167


      **ATTORNEYS FOR PLAINTIFF**