# EXHIBIT 3




Claim No. CFI 063/2024

IN THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS

IN THE COURT OF FIRST INSTANCE

BETWEEN

**ISTAR CAPITAL LIMITED**

Claimant

and

**AUDACIA CAPITAL LIMITED**

Defendant

**ORDER WITH REASONS OF H.E. JUSTICE SHAMLAN AL SAWALEHI**

**UPON** the Default Judgment of H.E. Justice Maha Al Mheiri dated 31 October 2024 in favour of the Claimant, with damages to be assessed (the "Default Judgment")

**AND UPON** the Claimant's Application No. CFI-063-2024/1 dated 13 December 2024 seeking an order for damages in the sum of EUR 6,500,000 (the "Claimant's Application")

**AND UPON** the Defendant's failure to file and serve any substantive evidence in response to the Claimant's Application by the deadline of 5 February 2025

**AND UPON** the dismissal of the Defendant's Application No. CFI-063-2024/3 dated 5 February 2025 seeking a further extension of time to file evidence

**AND UPON** reviewing the Claimant's Skeleton Argument dated 19 March 2025

**AND UPON** reviewing all the other submissions received

1

**IT IS HEREBY ORDERED THAT:**

1. The Defendant shall pay the Claimant the principal sum of EUR 6,500,000.

2. The Defendant shall further pay the Claimant the sum of EUR 1,415,753 by way of pre-judgment interest, calculated up to and including 24 March 2025. Thereafter, interest shall continue to accrue at the daily rate of EUR 5,342.47 until the day of issue.

3. The Defendant shall pay post-judgment interest on the total outstanding amount at the rate of 9% per annum, starting from the date of this Order until full satisfaction of the judgment sum, in accordance with Practice Direction No. 4 of 2017.

4. The Defendant shall pay the Claimant's costs of this Application, such costs to be assessed by the Registrar if not agreed between the parties.

Issued By:
**Delvin Sumo**
Assistant Registrar
Date of issue: 10 June 2025
At: 2pm

**SCHEDULE OF REASONS**

**Introduction**

1. The Claimant's Application concerns a Claim for damages arising out of a failed securities transaction governed by a Securities Sale and Purchase Agreement dated 14 June 2024 (the "Agreement"), under which Istar Capital Limited (the "Claimant"), a Dubai-based investment firm, agreed to sell to Audacia Capital Limited (the "Defendant"), an entity operating within the DIFC, 65 units of bonds issued by Voltaire Finance B.V. (the "Securities") for a total consideration of EUR 6,500,000 (the "Amount Owed").

2. Following the Defendant's failure to fulfil its payment obligations under the Agreement, the Court issued a Default Judgment in favour of the Claimant. As liability has been determined, the matter now comes before the Court for the assessment of damages and associated relief.

3. In the absence of any substantive opposition and upon careful review of the Claimant's evidence and legal submissions, the Court finds in favour of the Claimant and grants the relief sought.

**Background**

4. The Claimant and Defendant entered into the Agreement. Clause 3.2 of the Agreement sets out a three-step process for completion of the transaction. First, the Claimant was required to deliver a trade confirmation specifying the number of Securities to be sold and the payment details. Second, the Defendant was to transfer the agreed consideration to the designated brokerage account. Third, upon receipt of payment, the Claimant was to deliver a duly executed stock transfer form to give effect to the transfer of title in the Securities.

5. On 2 July 2024, the Claimant delivered a trade confirmation specifying the sale of 65 units at EUR 100,000 each, in accordance with the first step of the contractual sequence.

6. The Defendant did not make the required payment by the agreed date or thereafter, as required by the second step of the contractual sequence.

7. The Defendant did not comply with its payment obligations under the Agreement and has not remitted any portion of the EUR 6,500,000 consideration.

8. The Claimant states that, following the Defendant's non-payment, it attempted to mitigate its position by marketing the Securities on the secondary market. It further states that such efforts were unsuccessful, attributing this to the Securities being in default and lacking liquidity.

9. According to the Claimant's evidence, the Securities matured on 26 July 2023 and have not been redeemed. The Claimant further asserts that enforcement or disposal efforts have been impeded by structural limitations within the bond framework, including the allocation of bondholder voting rights.

10. Proceedings were subsequently commenced in the DIFC Courts, resulting in a Default Judgment issued by H.E. Justice Maha Al Mheiri on 31 October 2024. The Claimant's Application concerns the assessment of damages arising from that Default Judgment.

11. On 21 January 2025, the Defendant applied for an extension of time to file responsive evidence. That application was granted, with a deadline of 4 February 2025. The Defendant did not comply with the deadline and filed a second extension application on 13 February 2025. The second application was dismissed by the Court, which found that no adequate justification for continued non-compliance had been provided. The matter now proceeds to determination on the papers.

12. The Defendant has not disputed the validity or authenticity of the Agreement, nor denied receipt of the trade confirmation or knowledge of the payment timeline. No alternative explanation for non-payment has been advanced in the course of these proceedings.

13. In the absence of any contrary evidence from the Defendant, the Court proceeds to assess the quantum of damages based on the Claimant's unchallenged factual and expert material.

**Claimant's Submissions**

14. The Claimant submits that it is entitled to recover the Amount Owed. It contends that the Defendant's obligation to pay crystallised upon the Claimant's delivery of a trade confirmation, which specified the precise quantity and price of the Securities to be transferred. The Claimant argues that this event triggered the Defendant's payment obligation under Clause 3.2(ii) of the Agreement, independently of any need to establish loss or complete further contractual steps.

15. In support of that position, the Claimant refers to established principles of contract law, including those summarised in Chitty on Contracts (34th edn, 2023), which state that

where a contractual obligation to pay is contingent on the occurrence of a specified event, liability becomes fixed once that event takes place. The Claimant submits that the delivery of the trade confirmation was such an event, rendering the Defendant's obligation to pay absolute and unconditional.

16. The Claimant maintains that the proper measure of loss remains the full consideration under the Agreement. It argues that the Securities are effectively without value, such that its economic position had the contract been performed can only be restored by an award of EUR 6,500,000.

17. The Claimant has filed expert evidence from Mr Maxime Girard in support of its valuation case. Mr Girard opines that the Securities cannot be sold on any recognised or observable market, lack a functioning secondary market, and are not backed by any liquid or redeemable asset. He further notes that the issuer, Voltaire Finance B.V., is in financial distress and that no redemptions or repayments have been observed in respect of the bonds.

18. The Claimant has also submitted a witness statement from Mr Oleg Jelesko, which outlines the steps taken to mitigate loss, including attempts to sell the Securities on the secondary market. Mr Jelesko explains that the Claimant contacted a range of brokers and investors but was unable to locate any willing buyers. It is also stated that enforcement action under the bond terms is only available to bondholders holding at least 25 percent of the total issuance, a threshold the Claimant does not meet.

19. In these circumstances, the Claimant submits that it was not under a duty to pursue enforcement proceedings which it characterises as speculative and disproportionate. It refers to the limited transparency of the bond structure and governance arrangements that vest effective control in entities associated with the issuer.

20. In respect of interest, the Claimant seeks an award on a compensatory basis from the date of the Defendant's breach. It relies on both common law and DIFC principles, citing *Sempra Metals Ltd v Inland Revenue Commissioners [2007] UKHL 34* and Article 17(3) of the DIFC Law No. 5 of 2005 on Damages and Remedies.

21. The Claimant quantifies its pre-judgment interest at EUR 1,415,753 as of 24 March 2025, and claims additional interest at the daily rate of EUR 5,342.47 until payment. It also seeks post-judgment interest at 9 percent per annum pursuant to Practice Direction No. 4 of 2017.

**Defendant's Submissions**

21. The Defendant has not filed any substantive evidence in opposition to the Claimant's Application. Although it was granted an extension of time to file its responsive material, it failed to do so within the extended deadline. As stated prior, a further application for extension was dismissed by the Court.

22. During the course of those procedural exchanges, the Defendant made some representations concerning the underlying Claim. It contended that the issues raised by the Claimant involved complex and technical subject matter, including the valuation of distressed bonds, fixed-income instruments, and German market-listed securities. The Defendant submitted that it required additional time to identify and engage an appropriate expert in these areas and had initiated efforts to do so.

23. The Defendant also indicated that it had been engaged in discussions with representatives of the Tennor Group and believed that a consensual stay or extension would be agreed. This expectation influenced the timing of its second extension application. The Defendant further argued that a short extension would not materially prejudice the Claimant and would assist the Court in properly evaluating relevant valuation issues in what it described as a commercially significant matter.

24. On the substance of the Claim, the Defendant suggested that the Claimant may not have fully discharged its duty to mitigate loss. In particular, it referred to the possibility of coordinating with other bondholders to initiate collective recovery efforts against the issuer. It also highlighted the reported market capitalisation of Wild Bunch A.G., the issuer's principal asset as indicative of potential residual value in the Securities.

25. These contentions were addressed by the Claimant in reply. The Claimant submitted that enforcement options under the bond terms are constrained by a 25 percent minimum holding requirement, which it does not meet. It further adduced expert evidence contesting the reliability of market capitalisation as an indicator of recoverable value, citing concerns about illiquidity, volatility, and the lack of transparent rent financial disclosures.

**Discussion**

26. The legal principles governing this Application are well established. Where a contractual obligation to pay arises upon the occurrence of a defined precondition, and that precondition is demonstrably satisfied, the resulting obligation is generally enforceable either as a debt or, alternatively, as a claim in damages.

27. In the present case, Clause 3.2(ii) of the Agreement stipulates that the Defendant's obligation to pay the agreed consideration was triggered upon receipt of a trade confirmation issued by the Claimant. The Claimant has adduced evidence that such a trade confirmation was delivered on 2 July 2024, specifying the agreed transaction for 65 Securities at a unit price of EUR 100,000, giving rise to a total sum of EUR 6,500,000.

28. On the facts, the delivery of the trade confirmation constituted the event that activated the Defendant's obligation to pay. From that point, the obligation ceased to be contingent. The Defendant's failure to make payment constituted a breach of a primary contractual duty, entitling the Claimant to relief either in debt or in damages.

29. The characterisation of the Claim whether as a debt or as one for unliquidated damages does not materially affect the outcome. In either case, the appropriate measure of recovery is the unpaid purchase price, as the Securities were never transferred and no consideration has been received.

30. As summarised in McGregor on Damages and illustrated by authority such as *AerCap Partners 1 Ltd v Avia Asset Management AB [2010] EWHC 2431 (Comm),* where goods are not delivered and no available market exists for resale, the contract price may be awarded, provided there is no residual value.

31. In support of its position, the Claimant has submitted the expert report of Mr Maxime Girard, who concludes that the Securities are effectively illiquid, cannot be sold on any recognised market, and are unlikely to yield any financial return. He attributes this to the financial distress of the issuer, Voltaire Finance B.V., and the absence of a viable secondary market.

32. These expert findings are supplemented by the witness evidence of Mr Oleg Jelesko, who outlines the steps taken by the Claimant to identify alternative buyers and explore enforcement mechanisms. His account describes failed attempts to realise value and highlights structural constraints under the bond terms, including enforcement thresholds that the Claimant does not meet.

33. The Defendant has raised general contentions that the Claimant might have coordinated with other bondholders or pursued enforcement. However, these suggestions, made in the context of its extension application, were not supported by evidence or developed through submissions.

34. In assessing the Claimant's conduct, the Court must consider whether the Claimant acted reasonably in light of its legal entitlements and the limitations it faced. The duty to

mitigate does not compel a party to embark on speculative, costly, or procedurally impractical enforcement efforts with uncertain outcomes.

35. On the evidence before me, I do not consider that the Claimant failed in its duty to mitigate. Its attempts to realise value were reasonable in the circumstances and its decision not to pursue uncertain enforcement options appears commercially justified.

36. The Defendant has not filed any evidence challenging the factual or expert material adduced by the Claimant. I find no reason to reject the Claimant's uncontroverted evidence or to doubt its reliability or sufficiency.

37. Accordingly, I am satisfied that the Claimant is entitled to recover the Amount Owed, whether characterised as a debt or as damages. That figure represents the unpaid contract price, and no credible evidence has been offered to suggest an alternative valuation or residual recovery.

38. Turning to interest, the Claimant seeks an award on a compensatory basis from the date of breach. I accept that a compensatory interest award is appropriate in the present case. The Claimant's pre-judgment interest calculation, amounting to EUR 1,415,753 as of 24 March 2025, is supported by detailed evidence and is uncontested.

39. I find that this amount is fair and reasonable, having regard to the scale of the transaction and the relevant legal framework. From 25 March 2025 until the date of issuance of this Judgement, interest shall accrue at the daily rate of EUR 5,342.47.

40. As to costs, under RDC 38.8, I award the Claimant its costs, to be assessed if not agreed.

**Conclusion**

41. For the reasons set out above, I am satisfied that the Claimant has established a valid entitlement to the principal sum due under the Agreement whether as a contractual debt or, in the alternative, by way of damages. The Claimant has further demonstrated a proper basis for the award of interest on compensatory grounds and is entitled to the recovery of its legal costs incurred in connection with this Application.

42. Accordingly, the Defendant is ordered to pay to the Claimant the principal sum of EUR 6,500,000.

43. The Defendant shall further pay EUR 1,415,753 by way of pre-judgment interest, calculated up to and including 24 March 2025. Thereafter, interest shall accrue at the daily rate of EUR 5,342.47 until the day of issue.

44. Pursuant to Practice Direction No. 4 of 2017, the Defendant shall also pay post-judgment interest on the total outstanding amount at the rate of 9% per annum, from the date of this Order until payment is made in full.

45. The Defendant shall pay the Claimant's costs of the Application.